UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GERMIRA L. CARTER,

Plaintiff,

v.

STEFFENI STRAUB,

Defendant.

Case No. 25-13665
Honorable Laurie J. Michelson

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [13]**

Germira Carter, an inmate at the Michigan Department of Corrections' Cooper Street Correctional Facility ("JCS"), had major back surgery in 2024. Steffeni Straub, a JCS nurse practitioner , was Carter's assigned medical provider during his recovery. Carter says that despite significant pain and against the recommendation of his surgeon, Straub denied him access to a "medical mattress" during his recovery. So he filed this suit against Straub, alleging deliberate indifference to his serious medical needs in violation of the Eighth Amendment, as well as violations of the Americans with Disabilities Act, the Rehabilitation Act, and state law. (*Id.*)

Now before the Court is Defendant's Motion for Summary Judgment filed on February 5, 2026. (ECF No. 13.) Carter filed two separate responses to this motion—one on February 24, 2026 (ECF No. 17), and the other on May 11, 2026 (ECF No. 21). On May 21, 2026, Straub filed a reply. (ECF No. 26.) Because the facts and legal issues are adequately presented in the parties' briefs and on the record, the Court

rules without a hearing. *See* E.D. Mich. LR 7.1(f)(2). For the reasons that follow, the motion is DENIED.

**I.**

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a reasonable jury to return a verdict in favor of the nonmovant, and a fact is "material" if it may affect the outcome of the suit. *See Bethel v. Jenkins*, 988 F.3d 931, 938 (6th Cir. 2021) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The Court views the facts in the record, and the reasonable inferences that can be drawn from those facts, in the light most favorable to the nonmovant, Carter, and presents them as such below. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**A.**

On August 22, 2024, Germira Carter—then incarcerated at Lakeland Correctional Facility—was sent to Henry Ford Hospital for back surgery: a "transforaminal lumbar interbody fusion at L4-S1." (ECF No. 1, PageID.3, 9, 15.) After a few weeks of inpatient treatment, on November 1, 2024, Carter was discharged from the hospital and transferred to Cooper Street Correctional Facility. (*Id.*) Upon his discharge, Carter's doctors "recommended" he "receive a medical mattress to help with his recovery with his nerve's (sic) as well [as] with his sleep." (*Id.*); *see also id.* at PageID.16 (October 4, 2024, doctor's note, stating, "Patient would

benefit from medical grade mattress for support of surgical site, prevention of injury, prevention of skin breakdown and improve mobility.”).)

Not long after his arrival to JCS in November 2024, Carter met with his assigned medical provider, Nurse Practitioner Steffani Straub, for the first time. (*Id.* at PageID.9.) He told Straub he was in constant pain and asked her to review his neurosurgeon's recommendation that he be provided with a medical mattress. (*Id.* at PageID.3–4, 9.) But Straub denied that request, apparently because the note from Carter's neurosurgeon only recommended the mattress “as needed.” (*See id.* at PageID.4, 9.) She advised Carter to talk to his doctor and ask him to change the language of his recommendation from “as needed” to something more definitive, like “need[ed] [sic] to help with his recovery.” (*Id.* at PageID.9–10.)

So, at his next follow-up appointment, on December 9, 2024, Carter did just that. (*See id.* at PageID.10.) He asked his doctor to change the wording of the recommendation from “as needed” to something indicating that Carter *required* a medical mattress for his recovery. (*Id.* at PageID.10, 17.) Jill Marshall, CNP, who worked with Carter's neurosurgeon, indicated in a Progress Note that Carter “needs to have a medical grade mattress at the facility.” (*Id.* at PageID.17.) Carter later presented this amended recommendation to Straub. Despite having followed Straub's directive, Straub denied Carter's request for a medical mattress a second time—for reasons unknown. (*Id.* at PageID.10.) In January 2025, Carter filed a Step I grievance, reporting that he “continue[d] to suffer extreme pain as a result of having to sit and sleep on a mattress that is flat and uncomfortable in every way” but that

he was continuing to "speak with health officials concerning this matter." (ECF No. 13-1, PageID.83.)

At some point, a Legislative Corrections Ombudsman conducted a walk-through of Carter's housing unit, during which time Carter "showed her what [he] was laying on, and why [his] medical provider isn't honoring his Nerurosurgeon [sic] recommendation." (*Id.*) Then, a few days later, a white inmate, "Mr. William" received a medical mattress. (*Id.*) Carter asked William who his medical provider was and how he got the mattress, to which William responded that his provider was Straub, and that he got the mattress because he was "just a heavy white causation male, and I asked her for one." (*Id.*)

"[A] few months later," on April 29, 2025, Carter had another follow-up visit with his neurosurgeon. (ECF No. 1, PageID.10, 19–20.) Carter reported that he still had not received a medical mattress, and a nurse practitioner at the neurosurgeon's office again indicated that Carter "needs to have a medical grade mattress at the facility." (*Id.* at PageID.10, 20.)

The same Ombudsman representative conducted a second walk-through of Carter's unit sometime later. (*Id.* at PageID.10.) Carter again showed the representative his mattress, and she expressed to him that "these mattress[es sic] is inhumane for the population to be sleeping on," and indicated that Carter's "medical provider should support [his] Neurosuregon[sic]." (*Id.*)

Then, in late October 2025, he received a "Med-Call" from Straub to check-in on his pain levels. (*Id.* at PageID.11.) Carter told her that he "could be doing much

better if she would follow his neurosurgeon recommendations." (*Id.* at PageID.4, 11.) When Carter begged and pleaded for Straub to look at the mattress he was sleeping on, she replied, "You are in prison, what do you expect!" (*Id.* at PageID.4.) It was at this point Carter accepted that Straub was "never going to approve [him] for a Medical Mattress." (*Id.* at PageID.11.) He filed this case the next month, in November 2025.

In his complaint, Carter appears to plead claims for deliberate indifference under the Eighth Amendment, violation of the Equal Protection Clause, violation of the Rehabilitation Act, and various state law claims. (ECF No. 1.) Straub now seeks summary judgment on the sole ground that Carter has failed to properly exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). (ECF No. 13.) In support, she appends Carter's certified grievance records and a copy of the MDOC grievance policy. (*See id.*)

**II.**

Under the PLRA, a prisoner may not bring an action "under [§ 1983] or any other Federal law," to challenge his conditions of confinement until all available administrative remedies have been exhausted. 42 U.S.C. § 1997e(a); *Woodford v. Ngo*, 548 U.S. 81, 85 (2006). This exhaustion requirement serves two main purposes: it promotes efficiency by encouraging the resolution of claims at the agency level before litigation is commenced, and it protects administrative authority by affording the agency an opportunity to correct its own mistakes before being hailed into federal court. *See Woodford*, 548 U.S. at 89. Proper exhaustion under the PRLA requires

"compliance with an agency's deadlines and other critical procedural rules." *See id.* at 90. Said another way, the relevant rules for determining whether a plaintiff has properly exhausted his remedies "are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock*, 549 U.S. 199, 199 (2007); *Reed-Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010) (quoting *Woodford*, 548 U.S. at 90) (explaining that to properly exhaust, a prisoner must "follow[] the 'critical procedural rules' of the prison's grievance process.").

In Michigan's correctional facilities, prisoner grievances are governed by MDOC Policy Directive 03.02.130. (ECF No. 13-2.) Under that policy, if a prisoner cannot resolve his dispute with the staff member involved, he has five business days to file a Step I grievance. (*Id.* at ¶¶ W, CC.) If dissatisfied with the Step I response, the prisoner may submit a grievance appeal to the Step II Grievance Coordinator within ten business days after receipt of the Step I response, or if no timely response is received, within ten business days of the date the response was due. (*Id.* at ¶ JJ.) Finally, if the grievant is dissatisfied with, or does not receive, a Step II response, he has ten business days within which to file a final appeal at Step III. (*Id.* at ¶ NN.) An MDOC prisoner must first complete "all three steps of the grievance process" before he can file a lawsuit. (*Id.* at ¶ C.)

It is true that "[a]n untimely or otherwise improper grievance does not satisfy the PLRA exhaustion requirement." *Bailey v. Mich. Dep't of Corr.*, No. 19-13442, 2020 WL 4934314, at *2 (E.D. Mich. Aug. 24, 2020). But "[t]he rejection of [a] grievance[] is not . . . the end of the analysis." *Williams v. Winn*, No. 18-11060, 2019 WL 2252012,

at *6 (E.D. Mich. Feb. 27, 2019). Courts can "review the prison official's administration of the state grievance procedure," *id.*, and are "not required to blindly accept the state's application of the procedural rule." *Stone v. Harbaugh*, No. 23-10855, 2024 WL 2126667, at *3 (E.D. Mich. Apr. 15, 2024) (internal quotations omitted). In fact "an improper rejection [of a grievance]" may constitute sufficient exhaustion. *Bailey*, 2020 WL 4934314, at *5.

"A prisoner's failure to exhaust his available administrative remedies prior to filing suit 'is an affirmative defense under the PLRA,' which means 'that inmates are not required to specially plead or demonstrate exhaustion in their complaints.'" *Tubbs v. Payton*, No. 25-1950, 2026 U.S. App. LEXIS 27822, at *10 (6th Cir. Sept. 10, 2026) (citing *Jones*, 549 U.S. at 216). Thus, on summary judgment, the defendant bears the burden to show that "every reasonable jury would think the rejections were proper." *Johannes v. Washington*, No. 14-11691, 2016 WL 1253266, at *6 (E.D. Mich. Mar. 31, 2016); *see also Savoie v. Oliver*, 731 F. Supp. 3d 862, 872 (E.D. Mich. 2024) (denying summary judgment on exhaustion grounds where a "reasonable jury could conclude that MDOC improperly rejected" the grievance).

Carter pursued a grievance regarding his denial of a medical mattress through Step III (grievance number CS-25-01-0093-28E or "JCS-0093"). But Straub says this grievance was insufficient to exhaust Carter's claims because (1) it was rejected as untimely at all three steps of the grievance process, and (2) she was not specifically named in it. (ECF No. 13, PageID.60–64.) Neither argument persuades.

### A. Timeliness

Carter filed his Step I grievance on January 29, 2025, identifying January 15, 2025, as the "Date of Incident." (ECF No. 13-1, PageID.83.) On January 31, 2025, that grievance was rejected as "untimely." (*Id.* at PageID.84.) However, the grievance reviewer issuing that denial did not explain in what way the grievance was "untimely," writing only that "examination reveals that you have exceeded your time limits in filing a grievance on issue(s) that concern you, and at the same time provided no reasonable circumstance beyond your control that would have prevented you from filing this grievance in a timely fashion." (*Id.*)

Recall that under MDOC policy, "[t]he Step I grievance must be filed within five business days after the grievant attempted to resolve the issue with appropriate staff." (ECF No. 13-2, PageID.88.) Read narrowly, Carter's January 29 grievance—filed two weeks after the January 15 date of incident— would be too late. But Carter identifies January 15 as the incident date and not the date of attempted resolution. And his claim is that he raised the same concerns regarding his mattress to Straub, repeatedly.

In the body of the grievance, Carter represents that he had made attempts to resolve this issue from "10-4-24 thru 1-25-25." (ECF No. 13-1, PageID.83.) He further explains that he had "spoken with Health Care about this issue on several occasions" during this period, but the mattress issue "has went unresolved." (*See id.*) One could read the 1-25-25 date at the end of Carter's date range as the latest date on which he

attempted to resolve the denial of his request for a medical mattress. And in that case, his January 29 grievance four days later would be timely.

But the Court need not rely on this reading of the date range identified in Carter's grievance alone. The nature of his claim—that his back pain was exacerbated by his mattress—was ongoing. (ECF No. 1, PageID.10–11, 19–20.) And where a medical condition is "properly identified as 'ongoing,' . . . a grievance that identifies the persistent failure to address that condition must be considered timely as long as the prison officials retain the power to do something about it." *See, e.g.*, *Freeman v. Holmes*, No. 19-728, 2020 WL 4194483, at *6 (W.D. Mich. June 24, 2020) (quoting *Ellis v. Vadlamudi*, 568 F. Supp. 2d 778, 783–84 (E.D. Mich. 2008)); *see also Flack v. Hernandez*, No. 25-10752, 2026 U.S. Dist. LEXIS 64551, at *15–17 (E.D. Mich. Mar. 5, 2026). As Carter explained in the grievance, up until and through January 2025, he "continue[d] to suffer extreme pain as a result of having to sit and sleep on a mattress that is flat," that he had "spoken with Health Care about this issue on several occasions," that he "continue[d] to speak with health officials concerning [the] matter" but the issue remained "unresolved" and he was "still in pain as a result." (ECF No. 13-1, PageID.83.)

Alternatively, Straub argues that Carter should have filed his grievance in November 2024, within five days of when Carter first met (and first discussed the mattress with), Straub. (ECF No. 13, PageID.62.) This argument fails for a few reasons. While Straub first denied Carter's request for a medical mattress during their first meeting in November 2024, that was not the end of the story. Straub

suggested to Carter that his mattress request would be approved if and when he obtained a revised recommendation from his doctor making clearer that the mattress was necessary. He did so. (ECF No. 21, PageID.115; *see also* ECF No. 1, PageID.9–10; ECF No. 22, PageID.140.) It was only after Straub's *second* denial that Carter realized his request had been officially denied. *See, e.g.*, ECF No. 1, PageID.10 (Carter explaining that at his follow-up appointment with his neurosurgeon, he asked him to update his recommendation, "[i]n hopes Defendant Straub were going to honor[] my Neuroseurgeon[sic] recommendations"); *see also* ECF No. 21, PageID.114–115 (Carter describing his belief that Straub would re-submit his request after his neurosurgeon updated the recommendation, but that Straub was "playing a yard game with [him]").)

Put differently, Carter did not know "whether a final decision had been made" by Straub to deny him a mattress until *after* she rejected his amended doctors' note. *See Tubbs*, 2026 U.S. App. LEXIS 27822, at *13 (explaining that the "heart" of the exhaustion issue is not when the final decision itself occurred, but "when [the prisoner] understood" that a particular outcome had been reached.) Thus, taking the evidence in the light most favorable to Carter, in November 2024, there was no need for him to file a grievance, as he reasonably believed that if he submitted a revised recommendation from his neurosurgeon, his request for a medical mattress would be granted.

The second denial occurred sometime after December 9, 2024, when Carter received a revised doctor's note. (ECF No. 1, PageID.17.) But the record is not entirely

clear as to *when* exactly that rejection took place. That alone precludes the Court from determining whether the grievance reviewer's "untimely" finding was correct.

Another wrinkle in Straub's argument is the involvement of the Legislative Ombudsman. Reading Carter's complaint and response brief together, it appears that his second visit with the Legislative Corrections Ombudsman came sometime after Straub's second denial in December 2024 or January 2025. (ECF No. 21, PageID.128; ECF No. 1, PageID.10.) And in Carter's telling, a representative from the Ombudsman's office visited him, examined his current mattress, and informed him that he "needed to file a grievance," which he then did. (ECF No. 21, PageID.128.) So this, too, supports Carter's position that he did not know his claim had been finally denied and needed to be resolved by grievance, until sometime *after* December 2024.

Taken together, Carter alleges that (1) he followed Straub's instructions, believing that an amended doctor's note would entitle him to a medical mattress; (2) Straub then denied him a medical mattress for a second time, despite the fact that Carter did exactly as instructed; (3) Carter attempted to obtain assistance through the Ombudsman's office, which advised him to file a grievance; and (4) Carter then filed a grievance. Straub does not dispute or rebut these allegations. As such, the Court cannot conclude that Straub met her burden of showing that JCS-0093 was properly rejected as untimely.

For all these reasons, Straub has not met her burden of showing that "every reasonable jury" would find that rejection of JCS-0093 on timeliness grounds was

proper. *Johannes*, 2016 WL 1253266, at *6; *Savoie*, 731 F. Supp. 3d at 871–72. Thus, summary judgment is unwarranted on this basis.

**B. Naming**

Straub also argues that Carter's Step I grievance was insufficient to exhaust his claims because she was not specifically named in it. (ECF No. 13, PageID.60–61.) As set forth above, when asked in JCS-0093 what attempt he made to resolve the issue prior to writing the grievance, Carter stated: "This said grievant has spoken with Health Care about this issue on several occasions, however, the matter has went unresolved and grievant is still in pain as a result of the [im]proper medical attention." (ECF No. 13-1, PageID.83.)

True, MDOC's grievance policy provides that, when filing a grievance, "[d]ates, times, places, and names of all those involved in the issue being grieved are to be included." (ECF No. 13-2 at ¶ Y.) And the Sixth Circuit has held that a plaintiff fails to exhaust his administrative remedies against a defendant if he fails to name the defendant in a grievance and the state's grievance policy requires the grievant to do so. *See Sullivan v. Kasajaru*, 316 F. App'x 469, 470 (6th Cir. 2009).

"Nonetheless, courts have held that, even where the prisoner fails to specifically name the individual, a grievance will fulfill the purposes of exhaustion and give the defendant fair notice so long as it provides sufficient information to allow prison officials to identify the person being grieved." *Freeman*, 2020 U.S. Dist. LEXIS 128066, at *18–19 (citing *Burton v. Kakani*, No. 09-10893, 2009 U.S. Dist. LEXIS 87213, at *7 (E.D. Mich. Sept. 23, 2009)). The "Court may excuse a prisoner's failure

to identify by name a particular defendant in a grievance when it is obvious from the facts alleged in the grievance that the defendant was involved." *Nettles v. Edgar*, No. 22-119, 2022 WL 16556063, at *5 (W.D. Mich. Sept. 22, 2022) (citing *Calhoun v. Hill*, No. 07-11613, 2008 WL 4277171, at *3 (E.D. Mich. Sept. 17, 2008)).

Here again, Straub's reading of the grievance falters. As Carter describes it, each inmate at JCS is assigned a singular "Health Care" point of contact. (ECF No. 1, PageID.9–10.) Indeed, that is how Carter learned that a white inmate—William—received a mattress when Carter did not. He asked William who his prison medical provider was, and Williams named Straub. (ECF No. 1, PageID.13.) Because Straub "was [Carter's] primary medical provider at the time" of the events in question, (ECF No. 21, PageID.113), a reasonable jury could find that when Carter complained of repeated, fruitless discussions regarding the medical mattress with "Health Care," that he was referring to *his* assigned Health Care provider—Straub. The individual who denied his requests for a medical mattress.

And Straub does not argue, let alone show, that the grievance reviewers could not determine whose conduct was being challenged. Straub does not come forward with any evidence that Carter was seen or treated by anyone else in JCS "Health Care" who could have been the subject of JCS-0093. Indeed, the simple fact that Carter's grievance was *not* rejected on the grounds that he failed to name "all those involved in the issue being grieved" (ECF No. 13-2 at ¶ Y) arguably suggests that the grievance reviewers knew whose conduct was being challenged, or that they could have reasonably investigated the merits of Carter's grievance.

For these reasons, Straub's argument that JCS-0093 was not properly exhausted because it did not specifically name her also lacks merit.

## III.

For the foregoing reasons, Straub's Motion for Summary Judgment (ECF No. 13) is DENIED, and Carter's "Motion [] Opposing the Defendants' Motion for Summary Judgment for Failure to Exhaustation (sic)" (ECF No. 22) is DENIED as MOOT.

IT IS SO ORDERED.

Dated: September 18, 2026

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE